Argued and submitted February 27, on appeal, reversed and remanded with instructions to grant plaintiff's motion for relief from judgment under ORCP 71 B(1)(b) and to vacate award of attorney fees pursuant to ORS 35.346(7); cross-appeal dismissed September 15, 2004, petition for review allowed February 15, 2005 (338 Or 124)
See later issue Oregon Reports

## STATE OF OREGON,
by and through its Department of Transportation,
*Appellant - Cross-Respondent,*

*v.*

## Walter B. STALLCUP,
*Respondent - Cross-Appellant,*

*and*

## FLEET BUSINESS CREDIT CORPORATION,
fka Sanwa Business Credit Corporation,
a Delaware corporation,
*Respondent.*

000242E2; A117839

97 P3d 1229

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for appellant - cross-respondent. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

E. Michael Connors argued the cause for respondent - cross-appellant. With him on the briefs were Christopher P. Koback and Davis Wright Tremaine LLP.

No appearance for respondent Fleet Business Credit Corporation.

Before Haselton, Presiding Judge, and Wollheim and Schuman, Judges.

HASELTON, P. J.

## HASELTON, P. J.

In this condemnation action, the state appeals, assigning error to (1) the trial court's denial of the state's motion to set aside the judgment pursuant to ORCP 71 B or C; and (2) the trial court's consequent award of attorney fees to the defendant landowner pursuant to ORS 35.346(7).[1] Defendant conditionally cross-appeals, asserting that the trial court erred in striking certain matters from his pleadings and in excluding certain evidence. As described below, we conclude that certain reports generated by defendant's appraiser constituted "appraisals" within the meaning of ORS 35.346(5)(b) and that defendant's failure to provide those reports to the state requires that the judgment be set aside. For the same reasons, the award of attorney fees to defendant must be vacated. Finally, as explained below, we do not reach the merits of defendant's cross-appeal, given our disposition of the appeal. Accordingly, we reverse and remand.

Defendant owns property in Medford on which a "Wendy's" fast-food restaurant is situated. The state determined that it needed to acquire a portion of defendant's property adjacent to a road in connection with an improvement project. The state and defendant were unable to agree on the compensation that the state should pay for the taking and, on January 24, 2000, the state filed a complaint for condemnation, alleging that it had attempted to reach an agreement with defendant as to the compensation for the property, but was unable to do so, and that the true value of the acquisition was $70,800.

On September 26, 2000, counsel for defendant received a report from his appraiser, Michael Palmer, entitled "complete summary appraisal report."[2] That document, which was unsigned and marked "draft," provided two vastly different estimates of total compensation due. The first, based on the assumption that the Wendy's drive-through

---

[1] All references to ORS 35.346 are to the 2001 version of that statute.

[2] The disposition of this appeal turns on the proper characterization of that document. It is described in greater detail below. See 195 Or App at 246-47.

would not be damaged by the taking, estimated that the compensation due would be $80,591. The second estimate, based on the assumption that the drive-through would be affected, was $355,082.

On September 29, 2000, three days after receiving Palmer's report, defendant filed his initial answer in the condemnation proceeding. That answer alleged that the true value of the subject property was $355,082—the amount of the second of two estimates in Palmer's first "complete summary appraisal report." Defendant did not, however—either at that time or thereafter—disclose that report to the state.

Palmer subsequently generated other "complete summary appraisal reports" for defendant. In particular, on April 24, 2001, Palmer provided defendant with a second "complete summary appraisal report." Defendant disclosed that appraisal to the state pursuant to ORS 35.346. In July 2001, Palmer produced a third "complete summary appraisal report" but that document, like Palmer's first report, was not disclosed to the state. Finally, in November 2001, Palmer produced a fourth "complete summary appraisal report" for plaintiff, which plaintiff provided to the state pursuant to ORS 35.346.

On January 2, 2002, defendant filed an amended answer. The amended answer alleged that defendant was entitled to $611,511 in compensation. With his motion to file the amended answer, defendant's attorney filed an affidavit stating that the need to amend the answer was due to discovery of documents produced by the state that indicated that the highway project that caused the state's need for defendant's property would have significant impacts on defendant's restaurant business. Those alleged impacts included the possibility that the highway project, when completed, would result in traffic cutting through defendant's parking lot, as well as the possible displacement of the restaurant business entirely.

The state, in response, moved to strike from defendant's amended answer the allegation concerning the value of the property, asserting that it was based on damage theories that were too speculative. The trial court agreed that one

of the theories—relating to the impact of "cut-through" traffic on the continued viability of defendant's business—was too speculative because the appraiser had no basis to quantify the diminished use. Accordingly, the trial court granted the "motion to strike," in part.[3]

At trial, Palmer testified as a defense expert. Palmer described in detail the methodology underlying his valuation. He testified that the value of the property before the taking was $850,000 and that there were 62 parking spaces. He further testified that, after the taking, the number of parking spaces would be reduced to 35, which would be insufficient for a fast-food restaurant such as the Wendy's located on defendant's property. Using an income approach to value, Palmer concluded that the value of the property after the taking would be $370,000, and, thus, that the value of the property being acquired by the state was $480,000.

The jury ultimately returned a verdict determining that defendant was entitled to compensation of $135,000. Because that amount exceeded the state's highest settlement offer ($117,500), defendant was entitled to reasonable attorney fees pursuant to ORS 35.346(7).[4] Consequently, defendant submitted a fee petition supported by documentation.

In reviewing those submissions, the state's attorney discovered that Palmer had billed defendant's law firm for *four* "complete summary appraisal reports"—rather than only the two that had been provided to the state. Thus, the state first learned of the existence of the other two reports.

---

[3] The trial court's allowance of the state's "motion to strike" with respect to the alleged insufficiency of defendant's proof of the impact of "cut-through traffic" is the subject of defendant's conditional cross-appeal. *See* 195 Or App at 253-55.

[4] That statute provides, in part:

"If a trial is held or arbitration conducted for the fixing of the amount of compensation to be awarded to the defendant owner or party having an interest in the property being condemned, the court or arbitrator shall award said defendant costs and disbursements including reasonable attorney fees and reasonable expenses as defined in ORS 35.335(2) in the following cases, and no other:

"(a) If the amount of just compensation assessed by the verdict in the trial exceeds the highest written offer in settlement submitted by condemner to those defendants appearing in the action at least 30 days prior to commencement of said trial[.]"

Based on that revelation, the state moved, pursuant to ORCP 71 B and C, to set aside the judgment based on the newly discovered evidence.

In particular, the state argued that both of the previously undisclosed reports were "appraisals" that were subject to compulsory pretrial disclosure under ORS 35.246(5)(b), which provides:

> "In the event the owner and condemner are unable to reach agreement and proceed to trial or arbitration * * * each party to the proceeding shall provide to every other party a copy of every appraisal obtained by the party as part of the condemnation action."

Further, the state's attorney asserted in his affidavit in support of the motion to set aside the judgment that, if the newly discovered evidence had been timely disclosed, he would have subjected Palmer to material additional cross-examination.[5]

The trial court agreed that the state could not have, with due diligence, discovered Palmer's undisclosed report before trial and that cross-examination on Palmer's first report would probably have affected the trial's outcome:

> "Defendant also asserts that the evidence does not meet the standard of *Oberg v. Honda Motor Company*, 316 Or 263, 851 P2d 1084 (1993)[, *rev'd on other grounds sub nom Honda Motor Co. v. Oberg*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994)]. I find the newly discovered evidence does meet that standard. Had the information been available to assert that Mr. Palmer had found in a prior appraisal

---

[5] In its motion to set aside the judgment, the state asserted:

"[T]he jury was kept in the dark about the fact that the owner's expert appraiser concluded early on that the State's appraiser could be right. If the jury had heard that evidence, it probably would have concluded that the weight of the evidence supported a finding that the takings and damages did not exceed the State's offer of $117,500 the 30-day offer or benchmark of condemnation cases.

"That is a different conclusion than what was reached and it likely resulted from Mr. Palmer's testimony that the takings and damages were $480,000. The jury was likely influenced purely by the great disparity between the State's appraiser's estimate of just compensation and Mr. Palmer's. The jury's award would probably have been closer to the State's estimate had it known that Mr. Palmer expressed his opinion in September 2000 that just compensation could be a little over $80,000—$400,000 less than his trial testimony, and about $10,000 more than the State's estimate."

the amount of just compensation was $80,591.00 the jury might well have reached a different result."

Nevertheless, the court declined to set aside the judgment because it concluded that neither of the undisclosed reports (and the first in particular) was subject to mandatory disclosure under ORS 35.346(5)(b). In so holding, the court emphasized that the first "complete summary appraisal report" was labeled a "draft," and it expressed its concerns that a broad construction of ORS 35.346(5)(b) would abrogate the "work product doctrine" as set forth in ORCP 36 B, and Oregon case law:

> "Appraisers are experts retained by parties in condemnation cases to assist them in trial preparation. The mental impressions, conclusions, opinions or legal theories of this attorney expert are still protected, except that the appraisals are subject to disclosure, even if a party has decided not to use that appraisal. ORS 35.346(5)(b).

> "Mr. Palmer testified that the document in question was a draft and that it showed on its face that additional information was needed before a final determination of fair market value could be made. [The attorney for defendant] stated in argument that he considered the document to be a draft and an aid to him in preparing the case, including letting him know what information the appraiser needed in order to reach his final conclusions. Although [defendant's attorney] did not testify under oath, his statement was a certification, pursuant to ORCP 17 C. On this testimony and certification I find that Mr. Palmer and [defendant's counsel] were credible in their presentations and their characterization that the document was genuinely their interpretation of the document's status. While I am not bound by their interpretation, I find within the context of condemnation litigation [defendant's counsel] was entitled to have consultations with his hired expert to develop his position in the case and this document was produced for such a purpose.

> "Under the [Uniform Standards of Professional Appraisal Practice], any expressions of value, whether written or oral, and whether provided in a letter or draft of an appraisal, would meet the definition of an appraisal. Clearly, that approach is broader than the 1997 amendments [to ORS 35.346].

> "This interpretation of the statute may well lead to further efforts to avoid disclosure by labeling documents as drafts or preliminary statements. Perhaps it is better to completely open the process and provide open disclosure prior to trial. That determination does not belong to the Court, but to the Legislature."

The court subsequently awarded defendant attorney fees in excess of $185,000 pursuant to ORS 35.346(7).

On appeal, the state argues that the trial court erred in concluding that Palmer's undisclosed "complete summary appraisal reports" were not subject to mandatory disclosure under ORS 35.346(5)(b) and, thus, that the court erred in failing to set aside the judgment under ORCP 71 B and C. Defendant responds that the trial court correctly concluded that the term "appraisal," as used in ORS 35.346(5)(b), does not include preliminary or draft appraisals and that, consequently, neither of the undisclosed reports—and, particularly, the first "complete summary appraisal report," which had the word "draft" hand-written on the top—was an "appraisal" within the meaning of the statute.[6]

Before addressing the central issue of statutory construction, it is useful to describe the character of the critical document. The first "complete summary appraisal report," which stated that it was prepared for defendant's counsel, consisted of 54 pages, addressing, *inter alia*, "preliminary appraisal information," "assumptions and limiting conditions," "highest and best use," and "valuation methods." Accompanying and attached to that report was an unsigned cover letter from Palmer to defendant's counsel, which stated, in part:

> "As requested, the captioned property has been valued using generally accepted appraisal principles and practices. The report is intended to comply with the report requirements of the *Uniform Standards of Professional Appraisal Practice (USPAP)*, the Appraisal Institute and the client's appraisal requirements.

---

[6] While the state's legal arguments are applicable to the nondisclosure of both the first and third "complete summary appraisal reports," the focus of the parties' arguments is on the first report. Thus, our focus, too, is on that report.

"The purpose of the appraisal is to estimate the market value of the taking and damages resulting from the condemnation of the subject by the Oregon Department of Transportation. The estimated value is based on the following assumptions:

"(1)  The use of the drive-through may be adversely affected by the taking. It has been estimated that 55 percent of gross sales for a fast food franchise restaurant comes from the drive-through. Therefore, it is concluded that the income producing ability of the real estate will be negatively impacted if the utility of the drive through is diminished. Because it is unclear at this point whether or not the drive through will be affected, this analysis will present two valuations; one in which the use of the drive through is not damaged, and one in which it is damaged.

"(2)  It is unknown as to whether or not potential impact to the drive through can be mitigated. If the cost to cure such potential damages is less than that estimated in this report, a revision to the value estimate will be required."

The word "draft" was handwritten on the report's cover, and the "certificate of appraisal," which immediately followed the report's final "summary of values," was unsigned. During the hearing on the state's ORCP 71 motion, Palmer testified that the first "complete summary appraisal report" was his "initial and preliminary analysis." He further indicated that he spoke with defendant's attorney about gathering additional information to be used in further appraisals. Palmer stated that the document had been denominated a "complete summary appraisal report" for billing purposes and that, for the same reasons, subsequent similar documents had also been so titled.

We return to the text of the statute. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611-12, 859 P2d 1143 (1993). ORS 35.346 provides, in part:

"(1)  At least 20 days prior to the filing of any action for condemnation of property or any interest therein, the condemner shall make a written offer to the owner or party having an interest to purchase the property or interest, and

to pay just compensation therefor and for any compensable damages to remaining property.

"(2)   The offer shall be accompanied by any written appraisal upon which the condemner relied in establishing the amount of compensation offered. If the condemner determines that the amount of just compensation due is less than $20,000, the condemner, in lieu of a written appraisal, may provide to the owner or other person having an interest in the property a written explanation of the bases and method by which the condemner arrived at the specific valuation of the property. The amount of just compensation offered shall not be reduced by amendment or otherwise before or during trial except on order of the court entered not less than 60 days prior to trial. An order for reduction of just compensation offered, pleaded by the condemner in the complaint or deposited with the court for the use and benefit of the owner pending outcome of the condemnation action, may be entered only upon motion of the condemner and a finding by clear and convincing evidence that the appraisal upon which the original offer is based was the result of a mistake of material fact that was not known and could not reasonably have been known at the time of the original appraisal or was based on a mistake of law.

"* * * * *

"(4)   The owner shall have not less than 40 days from the date of receipt of the initial written offer and the accompanying appraisal from the condemner to accept or reject the offer. If the owner rejects the condemner's offer and obtains a separate appraisal, the owner shall provide the condemner with a copy of the owner's appraisal not less than 60 days prior to trial or arbitration.

"(5) (a)   Failure to provide the opposing party with a copy of the appropriate appraisal as provided in subsections (2) and (4) of this section shall prohibit the use of the appraisal in arbitration or at trial.

"(b)   In the event the owner and condemner are unable to reach agreement and proceed to trial or arbitration as provided in subsection (6) of this section, *each party to the proceeding shall provide to every other party a copy of every appraisal obtained by the party as part of the condemnation action*."

(Emphasis added.)

■     The term "appraisal" is not defined in ORS chapter 35—nor, indeed, in any Oregon statute. However, when used in this context, that term does have a plain, commonly understood meaning: "a valuation of property by the estimate of an authorized person[.]" *Webster's Third New Int'l Dictionary* 105 (unabridged ed 1993). Moreover, given the statute's multiple references to "a copy," *see* ORS 35.346(4), (5)(a), and (5)(b), the legislature necessarily intended that the statute apply only to written, and not oral, estimates of value by an authorized person. *Accord* ORS 35.346(2) (requiring condemner to provide landowner with any "written appraisal" upon which condemner relied as a basis for its initial offer of compensation).

There are no related statutes that, as a matter of context, either corroborate or detract from that "plain meaning" understanding of "appraisal" as used in ORS 35.346 generally, and in subsection (5)(b) particularly.[7] However, to the extent that any uncertainty may remain concerning the content of "appraisal," the legislative history of the 1997 amendments to ORS 35.346 confirms that those amendments, and specifically those that added subsections (2), (4), and (5), were intended to promote full reciprocal pretrial disclosure of expert reports regarding valuation.

The relevant portions of ORS 35.346 were enacted in 1997. Or Laws 1997, ch 797, § 1. Before those amendments,

---

[7] Both the state and defendant point to various regulations promulgated under ORS 674.310(2), pertaining to the licensing and oversight of real estate appraisers. Specifically, both note that (1) OAR 161-002-0000(3) (2000) defines "appraisal" as meaning " 'appraisal' as defined in [the Uniform Standards of Professional Appraisal Practice (USPAP)]" and; (2) the USPAP, in turn, defines "appraisal" as "the act or process of developing an opinion of value; an opinion of value * * * of or pertaining to appraising and related functions—*e.g.*, appraisal practice, appraisal services."

That reliance is unavailing. Even assuming, without deciding, that the version of OAR 161-002-0000(3) that the parties invoke might otherwise be material, that version, incorporating the USPAP's definition of "appraisal," was not promulgated until 1999, two years after the enactment of ORS 35.346(5)(b). Consequently, it is inapposite. *See Stull v. Hoke*, 326 Or 72, 79-80, 948 P2d 722 (1997) (subsequently enacted provision cannot serve as context in construing a statute); *Carey v. Lincoln Loan*, 165 Or App 657, 667, 998 P2d 724 (2000) (applying principle).

ORS 35.346 required that, at least 20 days before a condemnation action was filed, the condemner make a written offer, and that, if a verdict at trial exceeded the highest written offer submitted by the condemner at least 30 days prior to trial, the landowner could recover costs and attorney fees. Senate Bill (SB) 1036 (1997) was enacted in response to a litigation tactic being used by condemners to pressure landowners into accepting offers and not going to trial. That tactic, as described to the legislature, was that the condemner would make an offer and, if that offer was not accepted, would get an appraiser to testify at trial to a value lower than the offer, thus increasing the likelihood that the landowner would not receive compensation equal to the original offer. *See generally* Tape Recording, Senate Committee on Business, Law and Government, SB 1036, Apr 8, 1997, Tape 143, Side B (statement of Senator Neil Bryant); Testimony, Senate Committee on Business, Law and Government, SB 1036, May 13, 1997, Ex E (statement of Dick Bemis). In response to that tactic, and to facilitate settlement, the legislature enacted provisions requiring mutual disclosure of appraisals. *See* Tape Recording, House Committee on Transportation, SB 1036, June 16, 1997, Tape 129, Side B (statement of Senator Neil Bryant) ("So, there's a sharing of information and I think that usually that will help facilitate a settlement.").

■    We thus conclude that "any appraisal" in ORS 35.346(5)(b) means any written opinion by a qualified person regarding valuation of the condemned property that a party obtains "as part of the condemnation action." That is so regardless of whether the party actually relies on the appraisal. *Compare* ORS 35.346(2) (limiting production requirement under that subsection to appraisals on which the condemner relies as a basis for its initial offer). Indeed, "every appraisal" encompasses *unfavorable* appraisals that a party has obtained. That construction of "every appraisal" comports both with the plain meaning of the term and with the overarching legislative intent that the condemnation process be conducted without subterfuge, with full reciprocal pretrial disclosure of expert reports regarding valuation.

Palmer's first "complete summary appraisal report," as well as his third, fell within the scope of that definition.

Consequently, those reports were subject to mandatory production under ORS 35.346(5)(b).

Defendant contends, nevertheless, that Palmer's reports should not be deemed "appraisals" for statutory purposes because those reports did not represent Palmer's *final* opinion as to valuation. Defendant emphasizes, particularly, that (1) Palmer's report was "contingent" in the sense that it posited alternative valuations depending on differing assumptions; (2) that report was marked "draft"; and (3) Palmer did not sign the certification page—or, for that matter, any portion of the report. Defendant further contends, echoing the trial court's concerns, that mandatory mutual disclosure of all written opinions of valuation, including contingent, tentative, or "draft" opinions, would impermissibly abrogate work product protections.

We reject defendant's arguments, both generally and particularly. We note, at the outset, that nothing in the statutory scheme refers to "final" appraisals. Rather, for example, ORS 35.346(2) requires production of "any written appraisal upon which the condemner relied in establishing the amount of compensation offered." Nothing in that language suggests that, if the condemner relied on a "draft" or unsigned report, it could somehow evade mandatory production. The same is true of the owner's reciprocal production obligation under subsection (4).

Indeed, defendant's "finality" requirement would invite, and reward, subterfuge, subverting the statutory design. We emphasize that the trial court found no such motivation by this defendant,[8] but the potential is manifest: So

---

[8] We endorse the trial court's observation:

"It is unfortunate that the attorneys for the parties have let their arguments degenerate into casting aspersions on the other's motives or candor. The issue presented is not one of deception or bad motives, it is one of statutory interpretation of a new statute. The positions of both parties are valid positions which have not been addressed by an Oregon appellate decision."

We note, moreover, as did the trial court, that Palmer's and defense counsel's understanding and characterization of the undisclosed reports as mere "drafts" is hardly dispositive. *See* 195 Or App at 245-46 (quoting trial court's order denying ORCP 71 relief). Rather, the issue is one of statutory construction—and, more precisely, whether, given their content, Palmer's first and third "complete summary appraisal reports" were "appraisals" within the meaning of ORS 35.346(5)(b).

long as an appraisal report was marked "draft" or was unsigned, either the condemner or the owner could evade mandatory production.[9]

We also reject defendant's contention that Palmer's report was not an "appraisal" because it posited alternative valuations—one based on the assumption that the restaurant's drive-through would not be affected by the taking, and the second that it would be. Defendant's argument proceeds from a false premise, *viz.*, that the appraisal was impermissibly contingent because "it contains two alternative values that are dependent upon an unknown relevant fact." To the contrary, appraisals are commonly predicated upon assumptions and hypothetical conditions. Indeed, the 2000 USPAP standards for "summary appraisal reports," which are included in the record, explicitly provide that a summary appraisal report shall "state all assumptions, hypothetical conditions and limiting conditions that affected the analyses, opinions and conclusions[.]"

Finally, we fully appreciate that, as defendant contends, inclusive construction of "every appraisal" does, to some extent, abrogate the work product privilege described in ORCP 36 B and OEC 503.[10] That is, expert opinions regarding valuation, obtained in the course of condemnation litigation, must be produced—even though comparable reports in other contexts would not be subject to discovery. Still, that is the necessary consequence of the statute's design. Bluntly: that is *precisely* what the legislature intended.

■ Defendant next contends that, even if—as we have concluded—Palmer's undisclosed reports were "appraisals"

---

[9] Defendant asserts that, before the trial court, the state took the position that "draft" appraisals are not subject to mandatory production under ORS 35.346 and that that alleged concession somehow constrains our review. Defendant misapprehends our function in construing statutes. Regardless of any "concession" by a party, we are obligated to construe a statute properly. *See Stull*, 326 Or at 77 ("In construing a statute, this court is responsible for identifying the correct interpretation, whether or not asserted by the parties.").

[10] ORCP 36 B permits discovery of relevant material that is "not privileged." OEC 503(2) provides a privilege for "confidential communications" between a client's lawyer and the lawyer's representative such as an expert retained to facilitate the rendition of legal services. *See generally State v. Riddle*, 330 Or 471, 8 P3d 980 (2000) (describing extent and limitations on privilege).

that were subject to mandatory disclosure under ORS 35.346(5)(b), the state still would not be entitled to relief under ORCP 71 B because those appraisals do not qualify as "newly discovered evidence" under the six-part test set forth in *Oberg*, 316 Or at 272. Under that standard:

> "(1) [the evidence] must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as, with due diligence, could not have been discovered before the trial; (4) it must be material to the issue; (5) it must not be merely cumulative; (6) it must not be merely impeaching or contradicting of former evidence."

*Id.* (internal quotation marks omitted).

■       Defendant first asserts that, even if the appraisals had been disclosed, the state would not have been able to present them at trial because, before trial, the parties had agreed not to refer to the April 2001 "complete summary appraisal report" that defendant *had* disclosed—and, thus, it could reasonably be assumed that all appraisals would have been subject to the same agreement. We disagree. The parties' agreement pertained to a specific, disclosed appraisal. It did not, and could not, pertain to appraisals of which the state was unaware.

Defendant next argues that the appraisals did not qualify as "newly discovered evidence" because they were "merely impeaching." *See Oberg*, 316 Or at 277. As support for that argument, defendant points to the state's attorney's statement in his affidavit in support of the ORCP 71 motion that, had the appraisals been disclosed, he would have used them in cross-examination of Palmer. We disagree that the evidence was "merely impeaching." Although the evidence might well have been used to impeach Palmer on cross-examination, it also had other substantive significance. That is, the newly discovered evidence not only contradicted Palmer's testimony about what he believed the property was worth, but constituted substantive evidence about what the property *was* worth.

We reject defendant's other arguments on appeal without discussion.

We conclude that, because the appraisal was discoverable under ORS 35.346(5)(b) and constituted newly discovered evidence for purposes of ORCP 71 B(1)(b), the trial court should have granted the state's motion to set aside the judgment. Given our conclusion that the state was entitled to have the judgment set aside pursuant to ORCP 71, the trial court's award of attorney fees to defendant pursuant to ORS 35.346(7) must also be vacated.

■   Defendant also has filed a cross-appeal containing the following assignment of error:

> "In the event this court rules that the circuit court erred in denying ODOT's Motion for Relief from Judgment and Motion to Set Aside the Judgment under ODOT's Assignment of Error and this matter is sent back for a new trial, Defendant contends that the circuit court erred in its order granting ODOT's Motion to Strike in part and excluding evidence related to Defendant's redevelopment theory."

For the following prudential reasons, we decline to address the merits of the cross-appeal. As an initial matter, defendant is incorrect in his assumption that our conclusion that the trial court should have granted the state's ORCP 71 motion results in our court remanding the case for a new trial.[11] *See generally Lortenz Bruun Company v. Execulodge Corp.*, 313 Or 600, 603-04, 835 P2d 901 (1992) (ORCP 71 order was not an order granting a new trial); *see also Wills and Wills*, 94 Or App 546, 765 P2d 1260 (1988); *United Adjusters, Inc. v. Shaylor*, 77 Or App 510, 713 P2d 687, *rev den*, 301 Or 241 (1986). ORCP 71 and ORCP 64 are not interchangeable. Thus, while we acknowledge the possibility, or even likelihood, that these parties may need to retry the case as a result of our disposition of this appeal, our remand does not necessitate it.

■   Further, even if we were to assume that a new trial would necessarily occur in this case, defendant's cross-appeal does not raise the type of issue that we would address on the basis that it is likely to arise again on remand. In general, we consider issues to be likely to arise on remand when the trial

---

[11] We note, moreover, that the state did not seek a new trial in its ORCP 71 motion.

court or agency has determined a question of law that will still be at issue after the case is remanded. *See, e.g., Westwood Construction Co. v. Hallmark Inns*, 182 Or App 624, 50 P3d 238, *rev den*, 335 Or 42 (2002) (addressing ruling concerning the availability of certain type of attorney fees under ORS 87.060 as likely to arise on remand); *State v. McFeron*, 166 Or App 110, 999 P2d 470 (2000) (addressing propriety of jury instruction concerning ways in which state may prove intoxication because it was likely to arise on remand); *OR-OSHA v. Roseburg Lumber Co.*, 151 Or App 236, 949 P2d 307 (1997) (addressing agency's construction of legal standard set forth in administrative rule because it was likely to arise on remand).

Here, the issue presented by defendant on cross-appeal is not that type of issue. The trial court's ruling that defendant challenges was not based on a conclusion, for example, that a certain type of damages was not available in a condemnation action. Rather, the trial court's ruling concerned, in essence, the sufficiency of defendant's evidence of a certain type of damages. Specifically, the trial court's ruling that defendant seeks to challenge on cross-appeal was based on its conclusion that "[t]he absence of any quantification of diminished use of the property due to cut-through traffic and the lack of comparables needed to support the appraiser's opinion of value based on 'cut through traffic' renders such testimony speculative." Even assuming that our disposition of this appeal ultimately leads to a new trial in the present case, issues concerning the sufficiency of defendant's proof of damages will be based on a new record. Thus, no purpose would be served by offering our opinion about the sufficiency of defendant's evidence in a case in which the judgment was set aside.

On appeal, reversed and remanded with instructions to grant plaintiff's motion for relief from judgment under ORCP 71 B(1)(b) and to vacate award of attorney fees pursuant to ORS 35.346(7); cross-appeal dismissed.